IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
June 9, 2021 Session

## RARITY BAY PARTNERS v. RARITY BAY COMMUNITY ASSOCIATION INC. ET AL.

**Appeal from the Chancery Court for Monroe County**
**No. 21-173    Jerri Bryant, Chancellor**

———————————————————

### No. E2021-00166-COA-R10-CV

———————————————————

Members of a nonprofit corporation sought to compel production of election records from the election of the corporation's board of directors. The trial court ordered production of the records pursuant to a protective order. This Court granted the Rule 10 appeal to determine whether production of the election ballots is required under the Tennessee Nonprofit Corporation Act, whether the members have a privacy right with respect to their votes, and whether the trial court's protective order protects that privacy right. We hold that production of the ballots is required under the statute, members have a limited privacy right with respect to their votes, and the protective order protects that right.

**Tenn. R. App. P. 10 Extraordinary Appeal; Judgment of the Chancery Court Affirmed**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which KENNY ARMSTRONG and CARMA DENNIS MCGEE, JJ., joined.

Dana S. Pemberton, Knoxville, Tennessee, for the appellants, Michael Ayres, Amy Ayres, Clayton Wood, Doug Yoakley, Kris Schuh, Jeff Laws, Jim Atchley, Denzil Theis, and Rarity Bay Community Association, Inc.

Adrienne L. Anderson and Shannon van Tol, Knoxville, Tennessee, for the appellee, Rarity Bay Partners, fka Salem Pointe Capital Partners.

## OPINION

### FACTUAL AND PROCEDURAL HISTORY

Plaintiff/Appellee Rarity Bay Partners[1] ("Plaintiff") is a general partnership that owns lots in a subdivision known as Rarity Bay. Plaintiff is a member of the property association[2] for the subdivision, Rarity Bay Community Association, Inc. ("RBCAI"). RBCAI is a nonprofit corporation, and Plaintiff owns more than five percent of the voting power of RBCAI. In August 2020, Plaintiff filed a complaint against RBCAI and other parties, including RBCAI's Board of Directors ("the board") and its members,[3] in the Chancery Court for Monroe County (the "trial court"). The complaint sought, *inter alia*, to compel production of RBCAI's records from the 2019 board election, after one of Plaintiff's nominees lost by a narrow margin. In September 2020, Plaintiff filed a motion to require production of the records pursuant to the Tennessee Nonprofit Corporation Act, Tennessee Code Annotated § 48-66-101, *et seq.*[4] RBCAI opposed the motion, which was heard by the trial court on January 20, 2021. Following the hearing, the trial court granted Plaintiff's motion. The trial court did not specifically explain why it granted Plaintiff's motion, but ruled that RBCAI would be required to produce to Plaintiff the records related to the 2019 board election, "including, but not limited to, records reflecting the identity of members who voted in the 2019 election and the number of votes cast by each, . . . the ballots cast in the election, and any ballots rejected by [RBCAI] that it did not include in the election results." Additionally, the trial court ruled that these records would be produced pursuant to a protective order prohibiting disclosure of how members cast their votes, except as necessary for litigation.

Defendants filed a motion asking the court to reconsider its ruling, which was denied. In denying the motion, the trial court found, *inter alia*:

> 1. . . . The Records and Reports chapter of the Tennessee Nonprofit Corporation Act, found at Code Ann. § 48-66-101, et seq. requires the production of the Defendant nonprofit Association's election records requested by Plaintiff in this action, including all election ballots in un-

---

[1] Rarity Bay Partners was formerly known as Salem Pointe Capital Partners.

[2] The parties refer to RBCAI as a "property association" and a "homeowner's association." Neither party argues that there is a material distinction between those two terms. We will refer to RBCAI as a "property association" solely for ease of reference.

[3] Of the parties that Plaintiff originally filed the complaint against, only RBCAI and the board members are parties to this appeal, and therefore they will be referred to collectively as "Defendants."

[4] This motion and the order granting the Rule 10 application in this case, discussed *infra*, cite to Tennessee Code Annotated section 48-66-101, *et seq.*, when referencing the Tennessee Nonprofit Corporation Act. However, the entirety of the Tennessee Nonprofit Corporation Act is contained in Tennessee Code Annotated section 48-51-101, *et seq.* ("the Nonprofit Act"). We will refer to the entirety of the Nonprofit Act, not only section 48-66-101, *et seq.*, in conducting our analysis. *See **Eastman Chem. Co. v. Johnson**, 151 S.W.3d 503, 507 (Tenn. 2004) (citation omitted) ("The statute must be construed in its entirety, and it should be assumed that the legislature used each word purposely and that those words convey some intent and have a meaning and a purpose.").

redacted form, subject to the Protective Order entered by the Court.

2. There is nothing stated on the exemplar written ballot or in the election procedures that states the Association's elections are secret.

3. There is no way for the Plaintiff to make any sort of determination in this case without the appropriate discovery. The unredacted ballots are discoverable and should be produced.

4. The Protective Order entered by the Court adequately protects the interests of the voters and there has been no showing that it would be to anyone's detriment to reveal the ballots under the Protective Order.

This Court granted Defendants' motion for an extraordinary appeal under Rule 10 of the Tennessee Rules of Appellate Procedure on March 18, 2021. This Court ultimately also ordered all proceedings in the trial court to be stayed pending the outcome of this appeal, with the exception of allowing the trial court to rule upon a motion for an injunction not at issue in this appeal.

**ISSUES PRESENTED**

This Court granted review of the following issues:

1. Whether the Nonprofit Act requires the production of election ballots; and if so,

2. Whether the voters have a right to privacy with respect to their votes and, if so, whether the protective order entered by the Trial Court protects that right.

**DISCUSSION**

**I.**

We begin with the first issue on appeal: whether the Nonprofit Act requires production of election ballots. "Questions regarding the interpretation of a statute . . . involve issues of law. [T]herefore, the applicable standard of review is de novo, affording no presumption of correctness to the legal conclusions reached by the cour[t] below." ***U.S. Bank, N.A. v. Tennessee Farmers Mut. Ins. Co.***, 277 S.W.3d 381, 386 (Tenn. 2009) (citations omitted). "When interpreting statutes, a reviewing court must ascertain and give effect to the legislative intent without restricting or expanding the statute's intended meaning." ***Id.*** (citation omitted). "When the statutory language is clear and unambiguous, we must apply its plain meaning in its normal and accepted use, without a forced interpretation that would limit or expand the statute's application." ***Eastman Chem. Co.***, 151 S.W.3d at 507 (citations omitted). "Furthermore, every word in a statute is presumed

- 3 -

to have meaning and purpose." ***Tennessee Farmers Mut. Ins. Co.***, 277 S.W.3d at 386 (citations omitted). "Only if the plain language of a statute is ambiguous must the Court look beyond the statutory language to determine the legislature's intent." ***State v. Jennings***, 130 S.W.3d 43, 46 (Tenn. 2004) (citations omitted). In that event, "we may consider 'the broader statutory scheme, legislative history, and other sources' in discerning the legislative intent." ***In re Bentley D.***, 537 S.W.3d 907, 912 (Tenn. 2017) (citation and internal quotation marks omitted).

Defendants argue that the Nonprofit Act does not require the production of election ballots, but rather it requires that the only election record RBCAI maintain is a member list, pursuant to section 48-66-101(c). Section 48-66-101(c) states, "A corporation or its agent shall maintain a record of its members in a form that permits preparation of a list of the names and addresses of all members, in alphabetical order by class showing the number of votes each member is entitled to vote." Defendants also rely on the case of ***Sigel v. Monarch Condo. Ass'n, Inc.***, No. W2011-01150-COA-R3-CV, 2012 WL 2499551 (Tenn. Ct. App. June 29, 2012). In that case, a member of a condominium association ran in the election for the association's board of directors. ***Id.*** at *1. When he lost, he argued he was entitled to inspect the ballots under the Nonprofit Act and the Tennessee Condominium Act ("the Condominium Act"). ***Id.*** at *2.

Ultimately, this Court decided that the Condominium Act controlled, because the association's by-laws essentially stated as much. *See **id.*** at *5. We also noted that the Nonprofit Act was broader than the Condominium Act, and thus the more specific statute took precedence. *See **id.*** The petitioner argued that the ballots should be produced pursuant to the section of the Condominium Act mandating that the association's meeting minutes be produced. ***Id.*** at *7. He "reason[ed] that the ballots [we]re the only complete recordings of the actions taken by the Association members in the election, as the tally sheets d[id] not disclose which unit owners voted for which candidates." ***Id.*** This Court rejected that argument, instead deciding that the use of the term "minutes" in the Condominium Act was unambiguous and, as such, should be applied according to its plain meaning. ***Id.*** We concluded, "Black's Law Dictionary defines 'minutes' as 'memoranda or notes of a transaction, proceeding, or meeting.' *Black's Law Dictionary* 1087 (9th ed. 2009). We agree . . . that the term 'minutes' in Section 503(5) [of the Condominium Act] does not include the Association's written election ballots."

The petitioner in ***Sigel*** also relied on another section of the Condominium Act in arguing he was entitled to the ballots, which made reference to "financial and other records." ***Id.*** at *8. We concluded that the term "other records" was ambiguous, and thus we "turned to the entire statutory scheme and elsewhere to ascertain the legislative intent and purpose." ***Id.*** (citations and internal quotation marks omitted). After examining the Condominium Act's legislative history and employing principles of statutory construction, we declined to accept the petitioner's contention that the term "other records" included ballots. ***Id.*** at *8–9. We also based this conclusion on the reasoning that "such a

construction would [not] be consonant with the expectations and intent of our Legislature in interpreting the Tennessee Condominium Act." *Id.* at *10. We explained that "[w]e consider the Legislature's intent in light of the fundamental expectation of privacy and secrecy in voting by written ballot, as opposed to *viva voce* voting, voting by a show of hands, or other such public voting methods." *Id.* (citations omitted). And while "we decline[d] to extend the [state] constitutional right to secrecy of the ballot to an election for the board of directors for a condominium association," we still "interpret[ed] the intent of the legislature in enacting the Tennessee Condominium Act" against the backdrop of "the historic, fundamental right to secrecy of the ballot under the Tennessee Constitution." *Id.* at *11. We noted that "[o]ur interpretation would no doubt be different if Tennessee's Legislature were to state explicitly that a condominium association must disclose its election ballots. It has not." *Id.* Therefore, we concluded that "we [did] not believe that the Tennessee Legislature would have expected or intended written election ballots to be included in the documents available to condominium unit owners on demand pursuant to" the second section of the Condominium Act that the petitioner relied on. *Id.* Consequently, the petitioner was not granted access to the ballots.

The parties obviously disagree as to the application and effect of *Sigel* on the case-at-bar. Defendants contend that the language employed by the Nonprofit Act requiring production of "minutes" and "accounting records" is substantially similar to language employed in the Condominium Act and insufficient to require productions of ballots. Plaintiff, on the other hand, argues, *inter alia*, that the language of the Nonprofit Act is distinguishable from the Condominium Act and requires production of election ballots. In order to resolve this dispute, we must first turn to the statutory language at issue. *Cf.* ***Reynolds v. Gray Med. Invs., LLC.***, 578 S.W.3d 918, 920 (Tenn. Ct. App. 2018) (citing ***Mills v. Fulmarque, Inc.***, 360 S.W.3d 362, 368 (Tenn. 2012)) ("In determining legislative intent, we first must look to the text of the statute . . . .").

First, Plaintiff points to section 48-66-101(b), which states that "[a] corporation shall maintain appropriate accounting records." Plaintiff argues that because RBCAI is governed by the board, and the board exercises all power over RBCAI's finances, RBCAI's obligation to maintain accounting records under the Nonprofit Act includes maintaining records demonstrating that the board members have been elected validly. Moreover, Plaintiff avers that sections 48-66-102(b) and (c) provide the vehicle by which Plaintiff is entitled to inspect RBCAI's accounting records. Section 48-66-102(b) provides as follows:

> (b) A member is entitled to inspect and copy, during regular business hours and at a reasonable location specified by the corporation, any of the following records of the corporation if the member meets the requirements of subsection (c) and gives the corporation written notice at least five (5) business days before the date on which the member wishes to inspect and copy:

(1) Excerpts from any records required to be maintained under § 48-66-101(a), to the extent not subject to inspection under subsection (a);

(2) Accounting records of the corporation; and

(3) Subject to § 48-66-105, the membership list.

And section 48-66-102(c) states:

(c) A member may inspect and copy the records identified in subsection (b) only if:

(1) The member's demand is made in good faith and for a proper purpose;

(2) The member describes with reasonable particularity the purpose and the records the member desires to inspect; and

(3) The records are directly connected with the purpose for which the demand is made.

Defendants' brief contains little argument directly addressing whether the requirement to disclose "accounting records" includes the obligation to disclose election ballots. Instead, Defendants merely state that "accounting records" should be interpreted the same as "minutes" and "financial and other records" were interpreted under *Sigel*, as "insufficient to require the production of elections ballots." More broadly, Defendants argue that *Sigel* imposes a bright-line requirement that election ballots are not required to be produced unless the term "ballot" is "expressly included by the state legislature."

Respectfully, we cannot agree with Defendants' broad argument. Importantly, our reading of *Sigel* reveals that it did not impose such a requirement. In *Sigel*, we ultimately held that the Condominium Act did not require disclosure of election ballots after a deep and detailed analysis of the language of the statute, its legislative history, and the policy surrounding the issue. *Sigel*, 2012 WL 2499551, at *8–11. Certainly, such an analysis would have been unnecessary had we simply held that an explicit requirement in the statute to disclose "ballots" was necessary, under any circumstances, to require their disclosure. Instead, the only instance when we discussed the absence of an explicit mention of the term "ballots" occurred when we hypothesized that had the Legislature chosen to use the term "ballot" in the provisions regarding disclosure, the privacy interests considered would "no doubt" give way to the plain language utilized by the statute. *Id.* at *11. This statement does not, however, suggest that an explicit mention of ballots is the only method of requiring their disclosure.

Moreover, the **Sigel** panel's statement that the statute would be interpreted differently had different words been employed by the Legislature fully comports with our familiar rules of statutory construction, in which unambiguous language is given primacy. *See* **Friedmann v. Marshall Cty., TN**, 471 S.W.3d 427, 433 (Tenn. Ct. App. 2015) (quoting **Mills v. Fulmarque, Inc.**, 360 S.W.3d 362, 368 (Tenn. 2012) (citations omitted)) ("The text of the statute is of primary importance, and the words must be given their natural and ordinary meaning in the context in which they appear and in light of the statute's general purpose."). In contrast, Defendants' laser focus on the omission of a single word in the statute does not. Specifically, Tennessee law provides that the meaning of a statute is not be determined "from special words in a single sentence or section, but from the statute taken as a whole and viewing the legislation in light of its general purpose." **State ex rel. Bastnagel v. City of Memphis**, 224 Tenn. 514, 519, 457 S.W.2d 532, 534 (Tenn. 1970). As a result, the omission of the word "ballot" from the list of documents required to be disclosed does not resolve this dispute, if other language in the statute unambiguously mandates disclosure. Nor does the Nonprofit Act's reference to "accounting records" control the outcome here if other language unambiguously requires disclosure.

And we conclude that unambiguous language indeed provides for the disclosure of ballots in this case. In particular, Plaintiff also relies on section 48-66-101(e)(4), which states, "[a] corporation shall keep a copy of . . . . [t]he minutes of all meetings of members and records of all actions approved by the members for the past three (3) years [at its principal office.]" Plaintiff claims that under RBCAI's governing documents, the annual members meeting is the only mandatory meeting for members, and the only action the members take at that meeting is electing the directors, which Defendants do not appear to dispute. Therefore, Plaintiff contends, 48-66-101(e)(4) mandates that RBCAI "keep records showing members voted in approval of the specific directors that [RBCAI] claims won the director election." Plaintiff argues that it is thus entitled to inspect the records of actions approved by members and the board's minutes under section 48-66-102(a), which says:

> Subject to § 48-66-103(c), a member is entitled to inspect and copy, during regular business hours and at a reasonable location specified by the corporation, any of the records of the corporation described in § 48-66-101(e) if the member gives the corporation a written demand at least five (5) business days before the date on which the member wishes to inspect and copy.

In our view, section 48-66-101(e)(4)'s requirement that corporations keep for inspection "records of all actions approved by the members" is "sufficient" to provide for the disclosure of ballots in this case. Again, Defendants' brief mentions this requirement, but provides no specific argument as to the proper interpretation of this language. Unlike the phrase "other records" as used in the Condominium Act, however, we conclude that the phrase "records of all actions approved by the members" is clear and unambiguous.

- 7 -

Importantly, the phrase "approved by the members" is a defined term in the Nonprofit Act, as follows:

As used in chapters 51-68 of this title, unless the context otherwise requires:

'Approved by (or approval by) the members' means approved or ratified by affirmative votes that exceed the number of negative votes represented and voting at a duly held meeting at which a quorum is present or by a written ballot or written consent in conformity with chapters 51-68 of this title or by the affirmative vote, written ballot or written consent of such greater proportions, including the votes of all the members of any class, unit or grouping as may be provided in the charter, bylaws or chapters 51-68 of this title for any specified member action[.]

Tenn. Code Ann. § 48-51-201(1). Consequently, when 48-66-101(e)(4) refers to "records of all actions *approved by the members*," it explicitly and specifically refers to records of all actions voted for by members, including those actions voted for by written ballot over the past three years. (Emphasis added). In other words, the records referred to necessarily include election records, because the election of board members is an action that is approved by member votes. It would be absurd to hold that while the Nonprofit Act requires corporations to maintain records from its elections, these records do not include the ballots utilized to affect the election. *See **State v. Flemming***, 19 S.W.3d 195, 197 (Tenn. 2000) (citing ***State v. Legg***, 9 S.W.3d 111, 116 (Tenn. 1999)) ("[W]e will not apply a particular interpretation to a statute if that interpretation would yield an absurd result.").

Indeed, the definition of "approved by the members" explicitly mentions the use of written ballots, indicating that ballots were contemplated as documents involved in the approval of actions by members. And section 48-66-101(e)(4) states that records involved in that approval are subject to preservation, with no provisions excluding ballots from the ambit of that preservation requirement. Therefore, we interpret section 48-66-101(e)(4) as a broad and unambiguous directive that corporations must maintain all records of an election, including written ballots. Moreover, under section 48-66-102(a), a member is entitled to inspect and copy "*any* of the records of the corporation described in § 48-66-101(e)," subject to certain restrictions not at issue here. (Emphasis added). Taken together, the Nonprofit Act's use of the words "any" and "all" in sections 48-66-102(a) and 48-66-101(e)(4) amounts to a broad preservation requirement and a correspondingly broad right of inspection of records relating to elections.

In sum, the language of the Nonprofit Act is materially different from that found in the Condominium Act, namely in that it is unambiguous. The ***Sigel*** panel's resort to legislative history and policy to determine whether disclosure of ballots was mandated by the Condominium Act is therefore not warranted in this case. For the aforementioned reasons, the logical reading of the Nonprofit Act is that the Legislature intended for

nonprofit corporations to keep records of all actions voted for by members, including ballots, and for members to be entitled to inspect those records using the procedure outlined in section 48-66-102(a).[5]

Therefore, we affirm the trial court's decision to compel the production of the 2019 election records, including ballots. We agree with the trial court's reasoning with respect to the Nonprofit Act in its order on Defendants' motion to reconsider, i.e., "[t]he Records and Reports chapter of the [] Act, found at Code Ann. § 48-66-101, *et seq.*[,] requires the production of the Defendant nonprofit Association's election records requested by Plaintiff in this action, including all election ballots in un-redacted form . . . ."[6]

## II.

We now turn to the issue of whether voters in this case have a right to privacy with respect to their votes. Defendants argue that there is a fundamental expectation of privacy in voting by written ballot, as this Court explained in ***Sigel***. *See* 2012 WL 2499551, at *10 (citing 29 C.J.S. Elections § 322 (2012); 26 Am.Jur.2d Elections § 307 (2012)). Defendants also argue that the Tennessee Constitution recognizes the right to vote secretly in elections,

---

[5] We can find nothing else in the Nonprofit Act restricting the availability of election records, including ballots, for inspection by members. Nowhere in the Nonprofit Act are the terms "ballot" or "records" specifically defined. Section 48-57-108 specifies the contents of a ballot, but makes no reference to whether ballots must be produced:

A ballot must:

(1) Be in the form of a document;

(2) Set forth each proposed action;

(3) Provide an opportunity to vote for, or withhold a vote for, each candidate for election as a director; and

(4) Provide an opportunity to vote for or against or abstain from each proposed action.

Tenn. Code Ann. § 48-57-108(b).

[6] We view the Nonprofit Act and the rules of discovery contained in the Tennessee Rules of Civil Procedure as independent vehicles by which production of records may be sought (though, of course, the rules of discovery only apply if records are sought in the course of litigation). Moreover, our review of the first issue on this appeal is limited to an examination of the Nonprofit Act. Therefore, to the extent that the trial court relied on the rules of discovery as grounds upon which production of the records in this case is required, we express no opinion on that and affirm the trial court only based on the grounds explained *supra*. *See* ***Barner v. Boggiano***, 32 Tenn. App. 351, 222 S.W.2d 672, 677 (1949) ("It is well settled that if there is any ground upon which a decree before the appellate court on a broad appeal can be affirmed, it will be done, even though it be a different ground from that upon which the chancellor bases his decree."). Consequently, any issues or arguments raised by the parties regarding whether the rules of discovery require production of the ballots are pretermitted.

and that is the backdrop against which statutes should be interpreted, as this Court also stated in *Sigel*. *Id.* at *10, 11. Defendants point to an example of another state court holding that voters in a homeowners' association had a right to privacy in their votes under the state constitution, despite a state statute that gave a director on the association's board the "absolute right" to inspect "all . . . records and documents of every kind." ***Chantiles v. Lake Forest II Master Homeowners Assn.***, 37 Cal. App. 4th 914, 925, 45 Cal. Rptr. 2d 1, 7 (1995). Defendants concede, however, that in ***Sigel***, this Court declined to follow the ***Chantiles*** court and "extend the constitutional right to secrecy of the ballot to an election for the board of directors for a condominium association." 2012 WL 2499551, at *11 (citation omitted).

Plaintiff argues, *inter alia*, that the Nonprofit Act does not create privacy rights in votes in director elections. Instead, because the Nonprofit Act allows, for example, voting agreements between members, voting by proxy, and corporations to reject votes if there is a reasonable basis to doubt that the signature on the vote is valid, Plaintiff argues that that demonstrates that votes are not to be cloaked in secrecy. *See* Tenn. Code Ann. §§ 48-57-205, -208, and -301. Additionally, Plaintiff avers that RBCAI's governing documents also do not create a privacy right in votes, as they do not require secret ballots; at most, the by-laws authorize the board "to adopt election policies and procedures regarding the methods of casting votes, such as written ballots, secret ballots, or computer access." In addition, Plaintiff points to section 48-66-102(d) of the Nonprofit Act, which states, "The right of inspection granted by this section may not be abolished or limited by a corporation's charter or bylaws." Plaintiff also avers that the 2019 ballots contained no indication that they were confidential. However, according to Plaintiff, even if voters have a privacy interest in their votes, the trial court's protective order adequately protects that interest.

We begin our analysis of this issue by addressing Defendants' constitutional arguments. The provision of the Tennessee Constitution that Defendants rely on has been utilized only to preserve a right to privacy in voting in state-sponsored elections: "In all elections to be *made by the General Assembly*, the members thereof shall vote viva voce, and their votes shall be entered on the journal. All other elections shall be by ballot." Tenn. Const. art. IV, § 4 (emphasis added); *see also, e.g.*, ***Mooney v. Phillips***, 173 Tenn. 398, 118 S.W.2d 224, 225 (1938) (discussing the state constitutional right to a secret vote, created by Section 4 of Article 4 of the Tennessee Constitution, in the context of a state statute that dealt with state elections). That is not what we have here. Instead, at issue is a private nonprofit corporation's election of its board of directors. Therefore, the state constitutional right to a secret vote does not appear to apply. Indeed, a different panel of this Court in ***Sigel*** "decline[d] to extend the constitutional right to secrecy of the ballot to an election for the board of directors for a condominium association[.]" 2012 WL 2499551, at *11 (citation omitted). We do the same here. We see no material difference between the election for the board of directors of a condominium association, as was the case in ***Sigel***, and that of a property association, as is the case here, for the purpose of deciding whether there is a privacy interest in the votes. They are each nongovernmental, private

- 10 -

organizations, and the votes are not for public office. Therefore, we hold that the voters in this case do not have a constitutional right to privacy with respect to their votes.

Nor do we interpret the Nonprofit Act as creating an absolute right of privacy in election ballots. As we explained *supra*, the Nonprofit Act requires production of election records, including ballots, for members' inspection, pursuant to section 48-66-102(a). Therefore, there is necessarily no absolute privacy right attached to those records. However, section 48-66-102(a) only allows for members, not just any individual or entity, to inspect the records. Thus, there is a privacy right attached to the election records, to an extent. Other portions of the Nonprofit Act confirm this conclusion. For example, the Nonprofit Act allows for inspection of ballots by inspectors appointed by the corporation:

> (a) A corporation with members may appoint one (1) or more inspectors to act at a meeting of members and make a report in the form of a document of the inspectors' determinations. Each inspector shall execute the duties of inspector impartially and according to the best of the inspector's ability.
>
> (b) The inspectors shall:
>
> (1) Ascertain the number of members and their voting power;
>
> (2) Determine the members present at a meeting;
>
> (3) Determine the validity of proxies and ballots;
>
> (4) Count all votes; and
>
> (5) Determine the result.
>
> (c) An inspector may, but need not, be a director, member, officer, or employee of the membership corporation. A person who is a candidate for office to be filled at the meeting shall not be an inspector.

Tenn. Code Ann. § 48-57-209. This section clearly demonstrates that, if necessary, votes can be inspected by multiple appointed people, from inside or outside of the corporation, for the very purpose Plaintiff seeks the ballots here—to determine their validity. Thus, an absolute privacy right does not attach to the votes, but there are also restrictions on what the inspectors may do with the records. Along the same lines, section 48-66-104(a) states:

> (a) If a corporation does not allow a member who complies with § 48-66-102(a) to inspect and copy any records required by that subsection to be available for inspection, a court of record having equity jurisdiction in the county where the corporation's principal office (or, if none in this state, its

registered office) is located may summarily order inspection and copying of the records demanded at the corporation's expense upon application of the member.

\*     \*     \*

(d) If the court orders inspection and copying of the records demanded, it may impose reasonable restrictions on the use or distribution of the records by the demanding member.

This demonstrates an acknowledgement that privacy or other interests may require a court to tailor the production of records, including ballots showing who members voted for. These sections of the Nonprofit Act clearly show that the voters here do not have an absolute right to privacy with respect to their votes, but that there are some constraints on how the records of their votes may be used, and by whom. Thus, voters have a limited privacy right with respect to their votes.

RBCAI's governing documents likewise do not serve as a source of a privacy right. Even if, *arguendo*, RBCAI could create an absolute right of privacy in the votes at issue, it has not done so. *But see* Tenn. Code Ann. § 48-66-102(d) (prohibiting a corporation's governing documents from limiting members' record inspection rights under section -102); Section II, *supra* (explaining the clear legislative intent in the Nonprofit Act to create only a limited privacy right in votes within a nonprofit corporation). Article 7.7 of RBCAI's bylaws provides, in pertinent part:

The Board may adopt policies and procedures regarding methods of casting votes, such as written ballots, secret ballots, or computer access.

The fact that this article of the bylaws provides the option, but not a mandate, for votes to be secret, shows that RBCAI's governing rules do not afford voters an automatic right to absolute privacy in their vote. In fact, the board apparently adopted an election policy and procedure in 2012 in a document entitled Policy Resolution 10, where it specified, *inter alia*, that voting would take place via ballots, but it did not specify that it would take place by secret ballots. RBCAI argues that the term "ballot" denotes secrecy, but its own bylaws specify that a ballot can be secret, meaning ballots are not necessarily secret solely by virtue of being ballots. RBCAI also attempts to argue that the 2019 board election was, in fact, secret, stating:

The procedures set out that a Member is first asked to sign in a book for each lot the voting Member owns. A ballot is then given to the voting Member, and the Member is directed to a voting room. A staff person is present in the voting room to make sure no one enters unless there is an open voting area.

> Once the voting Member has voted, the voter is to fold and place the Member's ballot into a ballot box.

(Internal citations omitted). Respectfully, this procedure does not necessarily lead to the conclusion that voters have an absolute right to privacy with respect to their votes. The actual act of voting may take place in private, or the voting procedure may create an expectation of privacy in the act of voting, but that does not mean that after the election, the votes shall remain forever private. Additionally, Plaintiff contends, and Defendants do not dispute, that in the 2019 election, only thirty-two ballots out of 1,010 total were cast in person, with the remainder being voted early and "given to Monica at the office." Therefore, the above voting procedure, which Defendants assert demonstrates that the election occurred in private, did not apply to the vast majority of votes cast in the election at issue. Nor have Defendants pointed to any other evidence that persuades us that RBCAI has a clear policy of keeping votes secret.

Defendants cite no other controlling sources for the right to privacy that they contend must be applied in this context. Therefore, we hold that the voters here do not have an absolute privacy right with respect to their votes. To hold otherwise would lead to the absurd result that no member could ever contest the validity of an election in a nonprofit corporation. However, as we have explained, just because there is no absolute privacy right does not mean that anyone can inspect election records for any reason. The inspection has to be done in accordance with the terms of the Nonprofit Act, as set forth above.

## III.

The final issue, given that we have determined there is a limited privacy interest in the votes, is whether the trial court's protective order protects this limited privacy right. Again, section 48-66-104(d) of the Nonprofit Act says, "If the court orders inspection and copying of the records demanded [under section 48-66-102], it may impose reasonable restrictions on the use or distribution of the records by the demanding member." Thus, that section appears to vest courts with discretion to impose reasonable restrictions on how a member may use records. The trial court here exercised that discretion in entering the protective order. When reviewing a trial court's discretionary decision, we uphold the decision

> so long as reasonable minds can disagree as to propriety of the decision made. A trial court abuses its discretion only when it applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining. The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court.

- 13 -

***Eldridge v. Eldridge***, 42 S.W.3d 82, 85 (Tenn. 2001) (citations and quotation marks omitted). *Cf.* ***In re NHC–Nashville Fire Litig.***, 293 S.W.3d 547, 560 (Tenn. Ct. App. 2008) ("Generally, the granting, denying, or modifying of a protective order relating to discovery procedures under Rule 26.03 rests within the sound discretion of the trial court. Accordingly, the decision of a trial judge on a protective order is reviewed on appeal for an abuse of discretion."). The trial court's decision to issue a protective order prohibiting disclosure of whom voters cast their votes for, except as necessary to the litigation, was reasonable.

Defendants appear to advocate for at least redacting the ballots, so that the identities of voters and the candidates they voted for remain confidential. But redacting the ballots would defeat the purpose of requiring their production—if a member cannot examine who voted in an election and how they voted, there can be no way of validating the election results. Instead, the trial court's prohibition on disclosure of votes, except as necessary to the litigation, furthers the purpose of the litigation—to determine the validity of the 2019 election results—without unnecessarily disclosing information that may be considered sensitive. Therefore, the trial court did not abuse its discretion, and the protective order adequately protects the limited privacy right voters have with respect to their votes.

## CONCLUSION

The decision of the Chancery Court for Monroe County is affirmed. Costs of this appeal are taxed to Appellants Michael Ayres, Amy Ayres, Clayton Wood, Doug Yoakley, Kris Schuh, Jeff Laws, Jim Atchley, Denzil Theis, and Rarity Bay Community Association, Inc., for which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE